OPINION OF THE COURT
 

 Rosenblatt, J.
 

 A shareholder in a close corporation petitioned for dissolution pursuant to Business Corporation Law § 1104-a. Invoking Business Corporation Law § 1118, his brother, another shareholder, elected to purchase his shares at fair value. After the election, but before a determination as to fair value,
 
 *189
 
 the petitioning shareholder died. A shareholder agreement provided that, upon the death of any shareholder, the shareholder’s estate must surrender the deceased’s stock to the corporation in exchange for a specified price. That price was less than fair value. The issue before us is whether the brother who elected to purchase the petitioning shareholder’s stock at fair value remains bound by that election. We hold that he does.
 

 L
 

 Anthony Penepent started a family business in 1937. His four sons, Richard, Francis, Angelo and Philip, helped him run it. In 1952, father and sons formed Penepent Corporation, in which they each took a 20% interest.
 

 After incorporating, the five shareholders and the corporation entered into a shareholder agreement. It provided that upon the death of any shareholder, Penepent Corporation “shall” pay to the deceased’s estate (either through a life insurance policy or directly) a set price for all the deceased’s corporate stock.
 
 [1]
 
 The agreement further provided that “the stock so purchased shall be delivered and surrendered by the representative of the [deceased] to the Corporation, which shall thereupon retire such stock.”
 

 The corporation prospered over the next several decades. In 1979, the four brothers bought out their father’s interest, each becoming a 25% shareholder. By the late 1980s, however, a rift had formed among the brothers over how to transfer the business to their children: Richard and Angelo were on one side; Francis and Philip on the other. In May 1990, Philip petitioned for the dissolution of the corporation under Business Corporation Law § 1104-a. Invoking Business Corporation Law § 1118, Richard and Angelo elected to purchase Philip’s shares at “fair value.” While awaiting a judicial determination as to fair value, Angelo died. Supreme Court permitted Angelo’s estate to
 
 *190
 
 revoke his section 1118 election. Richard, thus stood to acquire all of Philip’s shares.
 
 [2]
 

 In June 1990, just before Angelo’s death, Francis commenced this proceeding, likewise seeking dissolution of the corporation under section 1104-a. Richard, in line to become the sole shareholder of the corporation, made a timely election under section 1118 to purchase Francis’ shares at fair value. Although Supreme Court never fully consolidated Philip and Francis’ dissolution proceedings, it decided to conduct a joint valuation hearing for Philip and Francis, followed by a second hearing to determine whether the fair value of Francis’ shares should be further discounted since Francis filed for dissolution several weeks after Philip. In December 1991, however, before the joint valuation hearing was completed, Francis died. By stipulation of the parties, Francis’ estate was substituted as petitioner.
 

 Shortly after Francis’ death, Richard, acting as secretary of the corporation, notified Francis’ estate that it was obligated to sell Francis’ shares to the
 
 corporation
 
 at the price specified in the shareholder agreement (which was less than fair value). Francis’ estate ignored the notification.
 

 In November 1992, Supreme Court entered a judgment establishing the fair value of Philip’s shares. On appeal, that judgment was affirmed. Richard thereafter moved to dismiss Francis’ dissolution proceeding for lack of standing, arguing that upon Francis’ death his estate was contractually obligated to surrender Francis’ shares pursuant to the shareholder agreement. In the alternative, Richard sought to revoke his section 1118 election. Supreme Court denied both motions, holding that Francis’ right to be paid fair value “essentially vested when [Richard] elected to purchase [Francis’] shares” and such a right survived his death. Moreover, the court refused to allow Richard to revoke his election, finding no “equitable considerations” that favored revocation.
 

 The Appellate Division affirmed and remanded to Supreme Court for a determination as to the fair value of Francis’ shares. During the second valuation hearing, Richard’s expert asserted that, due to the pendency of Philip’s dissolution proceeding at the time Francis filed his petition for dissolution, Francis’
 
 *191
 
 shares were less marketable than Philip’s and, thus, their fair value should be discounted. The referee rejected this argument, holding that to increase the illiquidity discount for Francis’ shares would “effectively impair a dissenting shareholder’s statutory right to be paid his proportionate interest in a going concern and that all shares of the same class receive equal treatment.” Supreme Court adopted the referee’s determination. The Appellate Division affirmed, as do we.
 

 IL
 

 Business Corporation Law § 1104-a empowers a holder of 20% or more of a closely held corporation’s stock to file a petition for dissolution of the corporation on the grounds that those in control have either committed “illegal, fraudulent or oppressive actions toward the complaining shareholders” or have “looted, wasted, or diverted for non-corporate purposes” the corporation’s assets (Business Corporation Law § 1104-a [a]). Business Corporation Law § 1118 is a corollary to section 1104-a. It grants non-petitioning shareholders, as well as the corporation itself, the right to avoid dissolution by timely electing to purchase the petitioning shareholder’s shares “at their fair value” (Business Corporation Law §1118 [a]).
 
 [3]
 
 Critically, any such election “shall be
 
 irrevocable
 
 unless the court, in its discretion, for just and equitable considerations, determines that [it] be revocable” (§ 1118 [a] [emphasis added]). If the parties are unable to agree on the fair value of the shares, the court “may stay the proceedings * * * and determine the fair value of the petitioner’s shares as of the day prior to the date on which such petition was filed, exclusive of any element of value arising from such filing” (Business Corporation Law § 1118 [b]).
 

 Francis petitioned for dissolution, and Richard (acting individually) made an irrevocable election to purchase Francis’ shares at fair value. The court stayed the dissolution proceeding to determine fair value. After the election, but prior to the fair value determination, Francis died. The shareholder agreement provided that, in the event of a shareholder’s death, the estate of the deceased shareholder must surrender the
 
 *192
 
 shareholder’s shares to the corporation in exchange for a contractually agreed upon price.
 
 [4]
 

 We must determine whether the mandatory buy-out provision in the shareholder agreement controls in the face of a section 1118 election made before the provision became operative, i.e., before Francis’ death.
 

 Richard argues that Francis was still a shareholder when he died and, thus, pursuant to the shareholder agreement, Penepent Corporation (not Richard individually) had a right to acquire Francis’ shares at the set price and retire them. He would attach no legal significance to his section 1118 election. According to Richard, Francis remained subject to the mandatory buy-out provision until the court fixed fair value and the stock purchase transaction was actually completed.
 

 In response, Francis’ estate essentially argues that at the time of his death Francis was a shareholder in name only. Richard had already made an irrevocable election pursuant to section 1118 and thus became legally bound to purchase Francis’ shares at fair value. We agree. Once a party makes an election, that party is obligated to purchase (and petitioner is obligated to sell) the petitioner’s shares at their fair value. Absent an agreement otherwise, divestiture events under a mandatory buy-out agreement — e.g., death, retirement, termination — will not operate to frustrate a preexisting section 1118 election.
 

 As a general rule, courts must enforce shareholder agreements according to their terms (see,
 
 Gallagher v Lambert,
 
 74 NY2d 562, 567). Such agreements avoid costly, lengthy litigation (see,
 
 Allen v Biltmore Tissue Corp.,
 
 2 NY2d 534, 542-543) and promote “reliance, predictability and definitiveness” in relationships among shareholders in close corporations
 
 (Gallagher v Lambert, supra).
 
 The question before us, however, is not whether the mandatory buy-out provision in the shareholder agreement was enforceable. Rather, the question is whether it was controlling where a valid section 1118 election had already been made.
 

 Our result follows the statute’s evolution. As originally enacted, section 1118 permitted electing shareholders to revoke their elections at any time. The amendment was prompted by concerns that majority shareholders could make section 1118 elections, prolong negotiations as to the fair value, and then
 
 *193
 
 revoke their elections, thus delaying the dissolution proceeding and exhausting the petitioning shareholder’s resources (Davidian,
 
 Corporate Dissolution in New York: Liberalizing the Rights of Minority Shareholders,
 
 56 St John’s L Rev 24, 71 [1981]). To prevent this mischief, the Legislature made section 1118 elections irrevocable and binding (L 1986, ch 861).
 

 Appellate Division cases holding that shareholders lacked standing to petition for dissolution under section 1104-a after shareholder agreements operated to divest them of their shares are distinguishable
 
 (see, e.g., Weiner v Anesthesia Assocs.,
 
 203 AD2d 455;
 
 Matter of Hesek v 245 S. Main St.,
 
 170 AD2d 956, 957;
 
 Martin Enters. v Janover,
 
 140 AD2d 587;
 
 see generally,
 
 Banks,
 
 The Unresolved Tension Between the 1979 Amendments to the BCL and Shareholder Agreements in Close Corporations,
 
 67 New York St Bar J 16 [Feb. 1995]). In the case before us, the divestiture event under the shareholder agreement— Francis’ death — did not occur until a year and a half
 
 after
 
 Francis commenced this dissolution proceeding and Richard made a valid election to purchase at fair value. Accordingly, we hold that, upon Richard’s election, Francis had a vested right to recover fair value for his corporate stock and that right survived his death.
 

 III.
 

 Lastly, Richard argues that the value of Francis’ shares in the corporation should be discounted because Philip’s dissolution proceeding was pending against the corporation at the time Francis petitioned for dissolution. We disagree. Business Corporation Law § 1118 offers no definition of “fair value.” It will depend on the circumstances of each case
 
 (see, Matter of Seagroatt Floral Co. [Riccardi],
 
 78 NY2d 439, 445). The objective in calculating “fair value” is to determine “what a willing purchaser in an arm’s length transaction would offer for petitioners’ interest in the company as an operating business”
 
 (Matter of Seagroatt Floral Co. [Riccardi], supra
 
 [citing
 
 Matter of Pace Photographers (Rosen),
 
 71 NY2d 737, 748]).
 

 To be sure, any litigation pending against the corporation could be considered in assessing the fair value of the corporation’s shares. Here, however, the pending dissolution proceeding had no bearing on fair value. When Francis commenced this dissolution proceeding, other shareholders — Richard and Angelo — had elected irrevocably to purchase Philip’s shares under section 1118. The corporation itself was in no danger of dissolution. Moreover, the corporation had not elected to
 
 *194
 
 purchase any of Philip’s shares at fair value and therefore had no financial interest in the litigation.
 

 The referee correctly observed that, in determining fair value, a minority shareholder’s stock should not be further discounted because of its minority status
 
 (see, Matter of Cawley v SCM Corp.,
 
 72 NY2d 465, 471). To impose upon petitioning minority shareholders a penalty because they lack control would violate two “central equitable principles of corporate governance.” First, a minority discount would deprive minority shareholders of their proportionate interest in the corporation as a going concern. Second, it would result in shares of the same class being treated unequally
 
 (see, Matter of Friedman v Beway Realty Corp.,
 
 87 NY2d 161, 169). When Francis commenced his proceeding, all parties were aware that Philip’s proceeding (in which Richard and Angelo had already made section 1118 elections to purchase Philip’s shares at fair value) would result in Richard and Angelo owning all of Philip’s stock. Under these settled principles, however, this fact can have no effect on the fair value of Francis’ shares.
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Smith, Levine, Ciparick and Graffeo concur; Judge Wesley taking no part.
 

 Order affirmed, with costs.
 

 [1]
 

 . The agreement also contained a mechanism by which the corporation could increase the set purchase price:
 

 “The parties hereto agree that the value of the stock may be changed from time to time hereafter * * *. A revaluation must be signed by all of the Stockholders and the Corporation.”
 

 Originally, the set price was $10 a share. In 1957, it was changed to $15 a share. Finally, in 1984, the set price was increased to $200 a share.
 

 [2]
 

 . In accordance with the shareholder agreement, Penepent Corporation paid Angelo’s estate the specified price for his own shares and retired them.
 

 [3]
 

 . A section 1118 election may be made “at any time within ninety days after the filing of [a § 1104-a petition for dissolution] or at such later time as the court in its discretion may allow” (Business Corporation Law § 1118 [a]).
 

 [4]
 

 .
 
 These are known as “mandatory buy-out” or “stock retirement” agreements (s
 
 ee generally,
 
 O’Neal & Thompson, O’Neal’s Close Corporations § 7.10, at 53-56 [3d ed]).