[No. B205731. Second Dist., Div. Five. Feb. 9, 2009.]

KEN COTTON, Plaintiff and Respondent, v.
EXPO POWER SYSTEMS, INC., et al., Defendants and Appellants.

## COUNSEL

Greenberg Traurig and Frank E. Merideth, Jr., for Defendants and Appellants.

Glickfeld, Fields & Jacobson and Craig M. Fields for Plaintiff and Respondent.

## OPINION

**KRIEGLER, J.**—In an action against the majority shareholders of a corporation for breach of fiduciary duties, a minority shareholder sought dissolution of the corporation and other relief. The majority shareholders invoked their rights to purchase the minority shareholder's interest under Corporations Code section 2000.[1] The trial court obtained an appraisal of the fair value of the shares that did not account for a related derivative action. The trial court confirmed the appraisal and deferred the date of the buyout until after the resolution of the derivative action. On appeal, the majority shareholders contend that the portion of the order deferring the purchase date was not authorized under section 2000. We conclude that a determination of the fair value of the shares of a corporation under section 2000 includes an assessment of the value, if any, of pending derivative actions and their effect on the fair value of the shares. The trial court's order in this case did not comply with the provisions of section 2000, and therefore, must be reversed.

## SECTION 2000

■ When a shareholder brings an action for involuntary dissolution, the corporation can avoid dissolution by purchasing the plaintiff's shares under section 2000, or if the corporation declines, then the holders of 50 percent or

---

[1] All further statutory references are to the Corporations Code, unless otherwise stated.

more of the voting power of the corporation may purchase the shares.[2] The shares must be purchased at their "fair value." (§ 2000, subd. (a).) "Fair value" is defined as "the liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation." (*Ibid.*) The valuation date is the date that the involuntary dissolution proceeding was commenced, unless the court, upon a showing of good cause, designates another date. (*Id.*, subd. (f).)

---

[2] Section 2000 provides in pertinent part: "(a) . . . [I]n any suit for involuntary dissolution, or in any proceeding for voluntary dissolution initiated by the vote of shareholders representing only 50 percent of the voting power, the corporation or, if it does not elect to purchase, the holders of 50 percent or more of the voting power of the corporation (the 'purchasing parties') may avoid the dissolution of the corporation and the appointment of any receiver by purchasing for cash the shares owned by the plaintiffs or by the shareholders so initiating the proceeding (the 'moving parties') at their fair value. The fair value shall be determined on the basis of the liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation. In fixing the value, the amount of any damages resulting if the initiation of the dissolution is a breach by any moving party or parties of an agreement with the purchasing party or parties may be deducted from the amount payable to such moving party or parties, unless the ground for dissolution is that specified in paragraph (4) of subdivision (b) of Section 1800 [fraud, mismanagement, abuse of authority, persistent unfairness toward shareholders, or property is being misapplied or wasted by those in control of the corporation]. . . .

"(b) If the purchasing parties (1) elect to purchase the shares owned by the moving parties, and (2) are unable to agree with the moving parties upon the fair value of such shares, and (3) give bond with sufficient security to pay the estimated reasonable expenses (including attorneys' fees) of the moving parties if such expenses are recoverable under subdivision (c), the court upon application of the purchasing parties, either in the pending action or [in the case of a voluntary dissolution, in a proceeding initiated in the superior court], shall stay the winding up and dissolution proceeding and shall proceed to ascertain and fix the fair value of the shares owned by the moving parties.

"(c) The court shall appoint three disinterested appraisers to appraise the fair value of the shares owned by the moving parties, and shall make an order referring the matter to the appraisers so appointed for the purpose of ascertaining such value. The order shall prescribe the time and manner of producing evidence, if evidence is required. The award of the appraisers or of a majority of them, when confirmed by the court, shall be final and conclusive upon all parties. The court shall enter a decree which shall provide in the alternative for winding up and dissolution of the corporation unless payment is made for the shares within the time specified by the decree. If the purchasing parties do not make payment for the shares within the time specified, judgment shall be entered against them and the surety or sureties on the bond for the amount of the expenses (including attorneys' fees) of the moving parties. Any shareholder aggrieved by the action of the court may appeal therefrom.

"(d) If the purchasing parties desire to prevent the winding up and dissolution, they shall pay to the moving parties the value of their shares ascertained and decreed within the time specified pursuant to this section, or, in case of an appeal, as fixed on appeal. . . . [¶] . . . [¶]

"(f) For the purposes of this section, the valuation date shall be (1) in the case of a suit for involuntary dissolution under Section 1800, the date upon which that action was commenced . . . . However, . . . the court may, upon the hearing of a motion by any party, and for good cause shown, designate some other date as the valuation date."

■ If the parties cannot agree on the fair value of the shares, the purchasing party may apply to the trial court to stay the dissolution proceeding and "ascertain and fix the fair value of the shares owned by the moving parties." (§ 2000, subd. (b).) If the purchasing party meets the statutory conditions, the court cannot impose any additional conditions on the purchasing party's right to elect to purchase the shares of the moving party. (*Reese v. Darden* (1951) 106 Cal.App.2d 699, 701 [236 P.2d 4] [interpreting former §§ 4658 & 4659, predecessors to § 2000].)

■ The court must appoint three disinterested appraisers to appraise the fair value of the moving party's shares. (§ 2000, subd. (c).) The order referring the matter to the appraisers prescribes the time and manner of producing evidence, if evidence is required. (*Ibid.*) Section 2000, subdivision (c) provides: "The award of the appraisers or of a majority of them, when confirmed by the court, shall be final and conclusive upon all parties." However, if the court concludes that the appraisers' award is incorrect, rather than confirm the award, the court must examine the matter de novo and fix the correct value. (*Venables v. Credential Ins. Agency, Inc.* (1956) 140 Cal.App.2d 724, 727 [295 P.2d 547].)

The court must then enter an alternative decree ordering the winding up and dissolution of the corporation unless payment is made "within the time specified by the decree." (§ 2000, subd. (c).) If the purchasing parties do not pay for the shares within the specified time, they are charged with the expenses of the moving parties, including attorneys' fees. (*Ibid.*) Any shareholder aggrieved by the alternative decree may appeal. (*Ibid.*; cf. *Dickson v. Rehmke* (2008) 164 Cal.App.4th 469, 476 [78 Cal.Rptr.3d 874] [holding under a similar valuation statute for limited liability companies that the appealable action is the alternative decree].)

## FACTS AND PROCEDURAL BACKGROUND

Expo Power Systems, Inc., distributes power systems and battery acid containment products. Plaintiff and respondent Ken Cotton owns one-third of the shares of Expo. Defendants and appellant Douglas Frazier and his wife Toni Frazier own two-thirds of Expo's shares. Cotton was Expo's primary salesperson. Revenues increased from $4.9 million in 1999 to $8.8 million in 2001. During this time, Expo paid substantial royalties to the Fraziers for the use of a patent that Cotton believes is actually owned by Expo. Expo leased office space in a building that was owned by the Fraziers and incurred a debt of $600,000 for tenant improvements. Expo's revenues did not continue to increase. By 2003, Expo could no longer pay rent, and as a result, the

Fraziers were unable to pay the mortgage on their property. A sale of the property with the bank's cooperation extinguished all of the obligations of Expo, the Fraziers, and Cotton. The Fraziers and Cotton had a falling out, and Cotton began working for a competitor.

On October 31, 2003, Cotton filed a complaint against Expo, the Fraziers, and the Fraziers' companies—Amber Management Company and Diversified Investments Group, LLC. The complaint alleged that the Fraziers had breached fiduciary duties to Cotton by diverting Expo's assets for their own purposes. Cotton sought a constructive trust, an accounting, declaratory relief, and dissolution of Expo.

On November 12, 2003, Cotton filed a shareholder's derivative action against the same defendants alleging similar causes of action for breach of fiduciary duty, conversion, accounting, and imposition of a constructive trust. The cases were deemed related and assigned to department 34 of the Los Angeles Superior Court, the Honorable Paul Gutman presiding. Cotton's company, Donlee Consulting Corporation, filed an action against Expo and the Fraziers for breach of contract, open book account, and money loaned based on unpaid consulting fees and loan payments.

On December 31, 2003, defendants filed a notice of election pursuant to section 2000 to purchase Cotton's shares of Expo. On January 7, 2004, defendants filed a motion requesting a stay of dissolution in order to fix the value of Cotton's shares, appoint appraisers, and set bond as required by section 2000. Defendants argued that substantial litigation would be avoided, because the value of Expo would be appraised, including the value of Cotton's derivative claims, and purchased by the Fraziers. Judge Gutman transferred the motion to department 85, the Honorable Dzintra Janavs presiding.

On April 4, 2005, Judge Janavs confirmed the appointment of three appraisers and ordered Expo to pay the costs of the appraisal.[3] The parties stipulated to give the appraisers authority to request evidence in aid of the appraisal.

In November 2006, the appraisers provided a report to the court in which they expressly declined to value Cotton's claims on behalf of Expo or Donlee Consulting Corporation's claims against Expo. The appraisers did not believe

---

[3] Although Expo was ordered to pay the costs of the appraisal, it appears from the record that the Fraziers are the purchasing parties.

their authority included a quasi-judicial evaluation of claims in litigation, or if it did, they concluded it would be wasteful to cause the parties to bear the expense of an evaluation that would be followed by a binding judicial resolution of the same claims.

The report further stated, "the measure of fair market value of an ongoing business is ultimately what a reasonable buyer, acting freely and without duress, would pay for the property in question and what amount a reasonable seller, also acting without duress, would accept. It is the judgment of the panel that no reasonable buyer would increase whatever amount he would otherwise pay for the business to obtain the benefits of the disputed claims in litigation. If anything, a reasonable buyer might place a relatively high valuation on the expense and burden of litigation as well as the risk of loss on claims against the company. Accordingly, in the real world, a potential buyer might reduce whatever amount he would otherwise pay. The panel has not attempted to consider a quantification of any such increase or reduction. The panel has concluded that it would not attempt to place any increase in value to reflect any valuation of the claims in this litigation."

The appraisers expressed their concern that the Fraziers' purchase of Cotton's shares for a value exclusive of the claims in litigation should not be a device to extinguish the claims and artificially eliminate whatever value they had. Therefore, the panel recommended any order permitting the Fraziers to purchase Cotton's shares be conditioned on an assignment by Expo to Cotton of the right to pursue the claims asserted in the litigation.

The report concluded that the value of Expo's shares, exclusive of the claims in litigation, was nominal, whether valued on a liquidation basis or as a going concern in liquidation. "Based on the foregoing discussion, the panel concludes that the fair appraised value of Expo Power Systems, Inc., exclusive of the claims in litigation advanced on its behalf and against it, is $100,000. The panel recommends that the purchase price of Cotton's shares be fixed at $33,333.33, together with an assignment by Expo of the claims to Cotton and the purchasers' express covenant that Cotton may continue to prosecute the Claims he has advanced in this action on behalf of Expo, and may recover personally an amount, if any, commensurate with his 33.33 percent share ownership. [¶] This report is subject to the court's determination of the proper scope of the panel's role in this proceeding. In the event the court determines that the matter should be remanded to the panel for reconsideration of any issues discussed herein, or for any other reason, the panel will undertake such further tasks as the court[] deems appropriate, and issue a further report, findings and recommendation."

Defendants filed a motion to strike the portions of the report about an assignment of claims to Cotton, confirm the report as amended, and decree the purchase price of the shares. Cotton filed a motion to remand the report to the appraisers. If the trial court did not consider an assignment of derivative claims to be proper, Cotton asked the court to either (1) direct the panel to value the derivative claims and consider the value of the claims in determining the value of Expo, or (2) increase the fair value of Expo by the value of any derivative claims that Cotton proved in the pending litigation.

At a hearing on April 9, 2007, defendants stated that they would not have incurred $60,000 for an appraisal under section 2000 if they had known that they would still have to litigate Cotton's claims. Judge Janavs denied defendants' motion to confirm the report and granted Cotton's motion, in part, by requesting responses from the appraisers to specific interrogatories. In their responses, the appraisers clearly stated that they had not valued any part of Cotton's derivative or direct claims on behalf of or against Expo. They added that the report reflected their explicit decision to make no valuation of any disputed claim in litigation, reserving the determination of the value of all disputed claims to court proceedings.

Defendants filed a motion for an order approving the appraisers' report, as supplemented by the interrogatory responses, and a decree to wind up and dissolve Expo unless the Fraziers paid Cotton $33,333 within 30 days of the date of confirmation of the report. At a hearing on January 15, 2008, Judge Janavs characterized the report as stating the determination of the fair value of the shares was not complete or final, because there was possibly some value in the derivative action that could affect the valuation of the shares that the appraisers could not determine without a trial. In other words, the fair value of Cotton's shares was $33,000, excluding one possible additional asset. Judge Janavs concluded it was not reasonable for the appraisers to conduct a trial of the pending actions in order to reach a fair value determination.

On January 22, 2008, Judge Janavs entered an order confirming the appraisers' report as to the fair value of Expo, exclusive of the value of the claims in the derivative action. The order stated the court could not determine the impact, if any, that the claims may have on the fair value of Expo. The order allowed the parties to litigate the claims before Judge Gutman by deferring the purchase date until 10 days after the entry of final judgment in the case. The court made no ruling as to whether any recovery by Expo on the derivative claims should be added to the appraised value of Cotton's shares. "If any of the parties dispute any adjustment or the absence of any adjustment to the fair value of Expo after final judgment is entered by [Judge Gutman], the disputing party shall file a motion in [this court] to resolve such dispute."

Defendants timely appeal from the order.[4]

## DISCUSSION

Expo and the Fraziers contend the trial court's order confirming the appraisers' report fixed the fair value of Expo's shares at $100,000. They further contend, however, that the court's deferral of the buyout date was not authorized under section 2000 and that portion of the order should be reversed. We conclude the order cannot be affirmed in any respect because the appraisal did not take into account the effect of the derivative action and was therefore incomplete as a matter of law, and the trial court's attempt to remedy this defect through a deferral of the buyout date until after the entry of judgment in the derivative action was contrary to the summary nature of the buyout proceeding.

*Standard of Review*

"[T]he superior court's interpretation of the statutory standard set forth in section 2000 is subject to de novo review on appeal. [Citations.]" (*Mart v. Severson* (2002) 95 Cal.App.4th 521, 530 [115 Cal.Rptr.2d 717].)

*Value of Derivative Action*

■ A derivative claim is a property right that belongs to the corporation. (*Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1108 [72 Cal.Rptr.3d 129, 175 P.3d 1184] (*Grosset*); *In re Countrywide Fin. Corp. Derivative Litigation* (C.D.Cal. 2008) 542 F.Supp.2d 1160, 1175.) It is properly viewed as an "asset" of the corporation. (*In re Countrywide Fin. Corp. Derivative Litigation, supra*, at p. 1175.) "Because a corporation exists as a separate legal entity, the shareholders have no direct cause of action or right of recovery against those who have harmed it. The shareholders may, however, bring a derivative suit to enforce the corporation's rights and redress its injuries when the board of directors fails or refuses to do so." (*Grosset, supra*, at p. 1108.) "If successful, a derivative claim will accrue to the direct benefit of the corporation and not to the stockholder who litigated it. [Citations.]" (*Id.* at p. 1114.)

---

[4] When the trial court issues an alternative decree pursuant to section 2000, the preferred practice is to use the term "decree" and expressly state the alternative disposition. (Cf. *Dickson v. Rehmke, supra*, 164 Cal.App.4th at p. 473.) However, even without this express language, we can construe the January 22, 2008 order as an alternative decree, which is appealable under section 2000. (164 Cal.App.4th at p. 473.)

The parties do not dispute that the value of the derivative action can be appraised.[5] When the Fraziers invoked the provisions of section 2000, they expected the value of Cotton's derivative claims to be appraised and accounted for in the valuation of the shares. The appraisers acknowledged that they could assess the merits and value, if any, of the derivative claims.

■ The fair value determination must reflect "the liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation." (§ 2000, subd. (a); cf. *Steinberg v. Amplica, Inc.* (1986) 42 Cal.3d 1198, 1209 [233 Cal.Rptr. 249, 729 P.2d 683] [a shareholder dissenting from a corporate merger may litigate claims of fraud and breach of fiduciary duty by corporate directors and officers in an appraisal proceeding, and to the extent that the shareholder proves the value of his shares was diminished by misconduct in connection with the merger, recovery could be adjusted in that proceeding].) Pending litigation against the corporation may be a consideration in assessing the fair value of the corporation's shares. (See *Brown v. Allied Corrugated Box Co.* (1979) 91 Cal.App.3d 477, 482 [154 Cal.Rptr. 170] [considering the effect of pending wrongful death litigation against the corporation on the fair value determination under former §§ 4658 & 4659, now § 2000].) Expert testimony can be received during the valuation hearing as to the effect of pending litigation on the fair value of the corporation's shares. (See *Matter of Penepent Corp.* (2001) 96 N.Y.2d 186, 194 [726 N.Y.S.2d 345, 750 N.E.2d 47].)

■ However, the appraisers clearly stated in their report and responses to interrogatories that they did not attempt to value Cotton's derivative claims, nor did they take the derivative claims into account in determining the fair value of Cotton's shares. The report therefore failed to appraise the value of a potential asset of the corporation.

*The Alternative Decree*

The trial court recognized that the appraisal was incomplete as to the issue of pending claims in litigation. The court was required to either obtain a

---

[5] We note that shareholders' derivative claims are evaluated in other circumstances as well. In a derivative action, if a special litigation committee of independent directors appointed by the corporation conducts an adequate investigation of the derivative claims and concludes that it is not in the best interests of the corporation to pursue the claims, then the trial court must dismiss the action. (*Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1005 [84 Cal.Rptr.3d 642].) In the context of a corporate merger, directors and controlling shareholders can engage an independent agency, such as a board of directors committee, special counsel or investment banker, to provide an independent opinion that derivative claims asserted on behalf of the corporation are without value to the corporation or to determine the fair merger price, considering the value of the pending derivative claims. (*Merritt v. Colonial Foods, Inc.* (1986) 505 A.2d 757, 758.)

complete appraisal of the fair value of Expo from the appraisers, or conduct a hearing to resolve the matter. (*Venables v. Credential Ins. Agency, Inc., supra*, 140 Cal.App.2d at p. 724.)

The trial court's deferral of the purchase date and potential modification of the appraisal value after entry of judgment in the derivative action is not consistent with the summary procedure contemplated by section 2000. Section 2000, subdivision (f)(1), mandates a determination of fair value as of the date the action was commenced, which in this case was November 2003. Five years have elapsed from the date of filing of the action. Defendants were entitled to a valuation of Expo as of 2003, not as of a date more than five years later. The conditional nature of the order is contrary to the section 2000 procedure.

■ The appraisers' suggestion to condition the buyout of Cotton's shares on an assignment to Cotton of the right to pursue pending derivative claims is not feasible either. The stock ownership requirements for standing to pursue a shareholder's derivative suit under section 800, subdivision (b), generally require a plaintiff in a shareholder's derivative suit to maintain continuous stock ownership throughout the pendency of the litigation. (*Grosset, supra*, 42 Cal.4th at p. 1115.) A derivative plaintiff who ceases to be a stockholder due to a voluntary or involuntary sale of stock loses standing to continue the litigation. (*Id.* at p. 1119.) "Because a derivative claim does not belong to the stockholder asserting it, standing to maintain such a claim is justified only by the stockholder relationship and the indirect benefits made possible thereby, which furnish the stockholder with an interest and incentive to seek redress for injury to the corporation. [Citations.] Once this relationship ceases to exist, the derivative plaintiff lacks standing because he or she 'no longer has a financial interest in any recovery pursued for the benefit of the corporation.' [Citations.]" (*Id.* at p. 1114.) The Supreme Court has not addressed whether California law provides exceptions to the continuous ownership requirement for equitable considerations such as those provided under Delaware law when a merger is used to wrongfully deprive the plaintiff of standing or is part of a reorganization that does not affect the plaintiff's ownership interest. (*Id.* at pp. 1110, 1119.) However, it seems doubtful that the present circumstances warrant an exception to the continuous ownership requirement, when the majority shareholders have exercised their statutory right to purchase plaintiff's shares for their fair value, as determined by an independent appraisal and fixed by the trial court.

## DISPOSITION

The order is reversed and remanded to the trial court with directions to obtain an appraisal taking into account the effect of the pending litigation on the fair value of Expo as of November 2003, or in the alternative, to allow the parties to litigate that issue before the court. The parties are to bear their own costs on appeal.

Turner, P. J., and Mosk, J., concurred.