Filed 11/7/14  Allal v. Halvas CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| FRANCOIS ALLAL, | B248675 |
| Plaintiff and Appellant, | |
| v. | (Los Angeles County Super. Ct. No. BC453457) |
| RONALD L. HALVAS et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County. Barbara M. Scheper and Robert H. O'Brien, Judges.  Affirmed.

Turner Law Firm and Keith J. Turner for Plaintiff and Appellant.

Zimmerman Walker & Monitz, Ronald M. Monitz, and Jeffrey C. Walker for Defendants and Respondents.

\* \* \* \* \* \* \* \* \* \*

Plaintiff Francois Allal sued his business partner, defendant Ronald L. Halvas, and their corporation, defendant Smart Card Integrators, Inc. (SCI), seeking dissolution of SCI, and damages for breach of fiduciary duty by Halvas, who owns a majority of SCI's shares. Plaintiff claims that Halvas terminated plaintiff's employment at SCI, and thereafter did not provide him with any dividends, all while Halvas "caused SCI to pay himself millions of dollars" by creating false promissory notes between himself and SCI so that he could receive bogus "loan payments" from the business.

To avoid dissolution of SCI, defendants moved under Corporations Code section 2000 for an appraisal of the fair value of plaintiff's shares so they could buy him out. Ultimately, a panel of three court-appointed appraisers found that SCI had a value of only $230,000, exclusive of liabilities. The parties asked the appraisers to consider two contested liabilities: (1) a claim by plaintiff for unpaid salary; and (2) SCI's debt to Halvas on the promissory notes. Because these liabilities were disputed, the appraisers deferred to the trial court to determine their legal validity, cautioning that if either debt exceeded $230,000, the value of SCI would be zero. Ultimately, the trial court confirmed the appraisal, after finding that SCI's debts to Halvas were valid and rejecting plaintiff's salary claim. The trial court ordered that plaintiff's shares could be purchased for a nominal fee of $500,which defendants paid.

After the appraisal was confirmed, plaintiff moved for leave to amend his complaint to add a claim for unpaid salary and for fraud against Halvas. The trial court denied the amendment as dilatory. The trial court also dismissed plaintiff's breach of fiduciary duty cause of action against Halvas, finding that claim was derivative, and that plaintiff lost standing to assert it once his shares were sold. The trial court also ordered plaintiff to pay half of defendants' litigation costs, including half the cost of the appraisal.

Plaintiff makes a number of contentions on appeal. He claims his breach of fiduciary duty cause of action was not derivative, and that the trial court's "sua sponte" dismissal of this claim violated his right to due process. Plaintiff also contends the trial court abused its discretion when it denied him leave to amend his complaint. Plaintiff contends the appraisal was not supported by substantial evidence, because the appraisers

relied on SCI's unaudited financial records, which were prepared by Halvas. Additionally, he claims the appraisal was plagued with due process errors, appraiser misconduct, and evidentiary errors. Lastly, he challenges the cost order. Finding no merit in any of his contentions, we affirm the judgment and order below.

## BACKGROUND

To resolve plaintiff's claims, we find it necessary to describe at considerable length the procedural history and evidence before the court in relation to the confirmation of the appraisal.

## I. Procedural History

On January 21, 2011, plaintiff sued defendants by verified complaint for involuntary dissolution, seeking annual reports and financial statements, and also stating a cause of action for breach of fiduciary duty. Plaintiff alleged he and Halvas were close personal friends in the 1980's, and that Halvas later became his personal accountant. Plaintiff acquired the rights to "smart card" technology in 1992, and formed Innovative Smart Card Technologies Ltd. in 1993 to market the technology. In 1996, plaintiff and Halvas became business partners, and formed a new entity, defendant SCI, to sell the smart card technology.

According to plaintiff, he was not paid a salary because the business was not profitable, even though he worked for SCI on a full time basis until 2008. To raise capital for the business, in 1999, plaintiff sold 5 percent of his stock to "California Plastic Ins." In 2004, plaintiff sold additional shares of his stock in the business to other individual investors because he was going through a divorce and needed money. That same year, Halvas purchased additional shares of plaintiff's stock. Halvas represented to plaintiff, and to others, that SCI was worth $20 million.

Beginning in 1998, and through 2006, Halvas prepared promissory notes (purportedly securing various loans made by Halvas to SCI), which he presented to plaintiff to sign. Plaintiff signed the notes, but in 2008, when presented with another note, plaintiff consulted with SCI's outside counsel, who advised him not to sign the note.

3

When plaintiff refused to sign the note, Halvas terminated plaintiff's employment. At the time, plaintiff held 42 percent of the shares of SCI, and Halvas held 57 percent.

After his termination, plaintiff did not receive dividends or any other benefit from his stock ownership, notwithstanding the profitability of SCI, and the fact that Halvas had paid himself millions of dollars. Moreover, according to plaintiff, Halvas was using the promissory notes to defraud plaintiff out of his share of the profits, and to divert money from SCI. The notes grossly overstated SCI's indebtedness to Halvas. Halvas had only loaned SCI a few hundred thousand dollars, but by May 2009, the promissory notes reflected a debt of over $3 million.

Between 2008 and 2009, Halvas paid himself over $500,000 out of SCI's accounts to reduce the balance of the promissory notes. In 2009, he paid himself an additional $746,000 to reduce the loan balance, a year in which SCI reported net losses of over $114,000. According to plaintiff, Halvas was "wasting the corporate assets" and "taking unreasonable and unearned salaries, profits and other benefits from SCI . . . ."

Plaintiff's breach of fiduciary duty cause of action additionally alleged that "[a]s a director of SCI, Halvas owed plaintiff fiduciary duties. The duties imposed . . . included the duty to act with the utmost good faith." Halvas violated these duties by refusing plaintiff access to SCI's records, paying himself unearned compensation but refusing to pay plaintiff compensation, "taking unfair advantage of the trust and confidence that he caused plaintiff to place in hi[m] as a purported friend and Certified Public Accountant," and using "bogus" promissory notes to divert money from SCI.

Defendants answered, and on March 29, 2011, moved under Corporations Code section 2000 to stay the case, and to determine the value of plaintiff's shares in SCI. Plaintiff opposed the motion.

At the May 12, 2011 hearing on defendants' motion, plaintiff asked the court to continue the hearing, arguing he "probably" would be dismissing the cause of action for involuntary dissolution, which would render defendants' motion "totally moot." The trial court denied the request for a continuance, and granted the motion. The court signed the proposed order submitted by defendants, which stayed the action and set forth the process

4

for nominating and selecting appraisers. Later that same day, plaintiff submitted a request for dismissal of his involuntary dissolution cause of action without prejudice. The document was stamped "received" on May 12, 2011, by the filing window, but was not filed until May 13, 2011. A clerk's dismissal, without prejudice, was entered on May 13, 2011.

On May 20, 2011, plaintiff filed a motion for reconsideration of the trial court's May 12 order granting defendants' motion under Corporations Code section 2000, arguing that entry of plaintiff's dismissal of his dissolution claim required the court to vacate its order granting the motion, as there was no longer any legal or factual basis for the order. Plaintiff argued he had an absolute right to dismiss his claim before the commencement of trial. That motion was set for hearing on June 29, 2011.

Defendants opposed the motion for reconsideration, urging that the dismissal was entered after entry of the order granting them relief under Corporations Code section 2000, and that the hearing on their section 2000 motion was the equivalent of a trial on their 17th affirmative defense, and therefore, plaintiff lost the right to unilaterally dismiss his first cause of action. Defendants therefore asked the court to strike plaintiff's belated dismissal and proceed with the appraisal.

On June 13, 2011, the trial court denied the motion for reconsideration, finding that "[d]efendant's motion under Corp. Code 2000 was dispositive of the 1st cause of action. Thus, it effectively disposed of plaintiff's 1st cause of action. The hearing on the motion was commenced and completed prior to plaintiff filing the dismissal without prejudice. (The Court accepts the pre-file lodging/filing date of May 12, 2011.) Thus, plaintiff may only file a dismissal with prejudice. Gray v. Superior Court 52CalApp4th 165, 173. [¶] The motion is denied."

On June 24, 2011, defendants moved ex parte for an order naming the appraisers appointed by the court under the May 12 order. Plaintiff opposed the motion. The trial court took the matter under submission, and ultimately denied the motion without prejudice. Its minute order denying the ex parte application noted that it was premature. The minute order also stated the court's view that the May 12 order had the effect of

making plaintiff's dismissal of the first cause of action to be with prejudice, and invited counsel to seek clarification if they disagreed. The clerk gave notice of the court's June 24, 2011 ruling by mail. On July 11, the court issued an order stating that plaintiff's first cause of action was dismissed with prejudice, as none of the parties had sought clarification of the court's June 24 order.

On July 19, 2011, defendants filed an ex parte application seeking reconsideration of the trial court's dismissal of the dissolution claim with prejudice, and seeking an alternative order vacating plaintiff's dismissal. The application also sought appointment of appraisers. Plaintiff opposed the motion, arguing the trial court lacked authority to sua sponte convert his dismissal into a dismissal with prejudice.

On July 20, 2011, the trial court granted the application, as follows: "Plaintiff has the right to dismiss the 1st cause of action at any time, however, in this case he filed it after the proceedings had started and thus his dismissal is with prejudice and not without prejudice. [¶] Both counsel now wish to proceed[] with the 1st cause of action and want this court to accept their stipulation that the dismissal filed on 5/12/11 be withdrawn. The [court] accepts the stipulation and the 5/12/11 dismissal is vacated. The parties now want to proceed[] with the appraisal process. Plaintiff's counsel further suggests that since the case is assigned to Department 30 that further proceedings be resolved there. The court agrees and since the ex-parte application of 6/25/11 was denied as moot any further proceedings, including reinstating the appointment of appraisers, are to be presented to department 30."

On August 2, 2011, defendants moved ex parte (in Department 30) for an order appointing appraisers. Plaintiff was not opposed to an order shortening time on the appointment of the appraisers, but did oppose appointment on an ex parte basis. On August 2, the trial court entered an order appointing appraisers, choosing two of those nominated by defendants, and one nominated by plaintiff. The court's order also set the compensation for the appraisers. The appraisers were ordered to provide their valuation reports within 90 days.

6

## II. The Appraisal Process

On December 9, 2011, plaintiff filed a status conference statement indicating that the appraisal was proceeding, but was taking longer than expected. He suggested that the trial date of February 14, 2012, be vacated, that the time to complete the appraisal be extended, and that another status conference be held in 60 days. He also indicated that "[u]ntil the Appraisers provide their determination of the 'fair value' of Allal's shares, it is impossible to predict the next steps of this case. . . . [¶] . . . [¶] For instance, the Appraisers may not address the legal issue of whether Halvas' loans/Promissory Note is even valid and unenforceable . . . . [¶] Additionally, the Appraisers will probably not address Allal's affirmative claim for breach of fiduciary duty against Halvas. . . . The Appraisal will probably not value or determine such claims that are included in the Third Cause of Action for Breach of Fiduciary Duty. Because the action was stayed, Allal has not completed discovery as to his Third Cause of Action. He will need a reasonable time to do so before trial can be set on the remaining claim."

On January 6, 2012, the trial court entered an order extending the time to complete the appraisal, vacating the trial date, and setting a status conference concerning the post-appraisal procedure for February 14, 2012. Any briefs to be considered at the status conference were to be filed and served by February 7.

On February 7, 2012, defendants filed a post-appraisal status conference statement indicating that the appraisers had finished their appraisal, and expected to complete their report imminently. As for "next steps," defendants urged the court to set a hearing date for confirmation of the appraisal report, along with a briefing schedule. In the event that the award was confirmed by the court, and plaintiff was paid for his shares, defendants posited that his remaining claims should be dismissed because the claims were derivative, and that once his shares were sold, plaintiff would lose standing to bring them. In the event that defendants did not buy plaintiff's shares, defendants agreed that the stay of the action would be lifted, and that "the parties may litigate Plaintiff's remaining claims . . . ." The status conference statement also included legal authority and analysis supporting defendants' belief that plaintiff's remaining claims were derivative.

7

Plaintiff filed his status conference statement on February 10. Plaintiff urged that his breach of fiduciary duty claim was not derivative, and that this claim was not part of the appraisal process. He reasoned that "at this point in the case, it is impossible to determine whether the upcoming Appraisal award or report will resolve the issues raised by Plaintiff's Breach of Fiduciary Duty claim. Accordingly, Plaintiff requests and reserves the right to address Defendants' argument that it is a derivative claim until he and [his] counsel . . . are provided a reasonable opportunity to review the upcoming Appraisal award or report."

The court continued the February 14 status conference until March 22, as the appraisal report had not yet been completed.

The appraisal report was lodged with the court on February 17, 2012. The three appraisers submitted one collective, unanimous report. The appraisers set the fair value of the entire stock of SCI as $230,000 before considering offsets for liabilities, such as the promissory notes owing to Halvas, and unpaid salary claimed by plaintiff. If the liabilities were considered, the appraisers concluded that SCI's stock had no value. Because the debts were disputed by the parties, the appraisers deferred to the court to decide the validity of the debts.

In making their report, the appraisers relied on SCI's tax returns for 2006 to 2011, internal financial statements for 2006 to 2010, and partial interim financial statements for the "approximate 7.68 months ending January 21, 2011 and for the seven (7) month periods ending December 31, 2009 and 2010 without additional verification." The appraisers also relied on representations made by Halvas and plaintiff about SCI's operations.

Among the exhibits appended to the appraisal report was a corporate resolution, adopted in 1996, authorizing the business to borrow up to $2 million from either plaintiff or Halvas, at an interest rate of 10 percent per year. There was also an August 23, 2011 letter from plaintiff's counsel to the appraisers, claiming that plaintiff was owed over $913,000 in unpaid salary.

At the March 22 status conference, the court observed that some sort of "hearing" or "court trial" was required to determine the validity of the claims not decided by the appraisers. The parties requested time to mediate their dispute. Defendants argued that a hearing was required to confirm the appraisal report, and to determine the validity of the two disputed liabilities. Defendants also argued that "once the award is confirmed, there will not be any further issues. All claims are done. Plaintiff disagrees. Plaintiff thinks there are still issues even if the order is confirmed . . . ." The trial court suggested that they set a date for a court trial, and "at the final status conference we can . . . hash out if there needs to be more than one phase or if counsel for either side disagrees with me regarding what aspects of the appraisal report are properly addressed to the court beyond [these] debt claims and anything else that either party thinks the court need[s] to decide."

The court indicated that it was open to hearing from plaintiff whether the entire case would be disposed of upon confirmation of the appraisal report. Both parties cautioned against setting a trial date, and simply showing up without any notice of exactly what was to be tried. Plaintiff suggested that the court establish a briefing schedule, and approach the confirmation process as if it were a noticed motion, whereby defendants would file a motion to approve the appraisal, and the court would then ultimately decide if it needed additional evidence. The court opted to set a date for a court trial on the appraisal and the liabilities, and to allow the parties to submit briefs in advance of that date. The court set the hearing for July 30, with briefs to be exchanged no later than July 23. The court also set a date for a court or jury trial of any remaining issues on November 19. The court requested trial briefs addressing whether, following confirmation of the appraisal, there were any remaining issues to be tried. The court ordered the discovery stay to be lifted.

The parties began mediation. They met with a mediator on June 15 for 3 1/2 hours, but the mediation ended in no agreement. The parties stipulated to continue the confirmation hearing until August 30, 2012. On August 2, 2012, plaintiff moved ex parte for various discovery orders, and also for an order "clarifying the scope of the

9

[confirmation hearing]."[1]  Specifically, plaintiff sought clarification of whether the confirmation hearing would resolve the "two alleged liabilities" that the appraisers did not determine.  There is no transcript of the hearing on this application, but it appears that the ex parte application was denied as "untimely."

In late August, the parties reached a tentative settlement, and stipulated to continue the confirmation hearing until October 1, 2012.  The parties were later ordered to participate in a mandatory settlement conference, and the October 1 confirmation hearing was taken off calendar.  The parties were unable to settle the case at the settlement conference, and stipulated to set the confirmation hearing for December 3, 2012, and that any trial date, if necessary, would be set following the confirmation hearing.  The parties stipulated that a "status conference should be held after the Confirmation Hearing is ruled upon to determine the issues remaining to be tried, if any, and the need for expert testimony or discovery before trial."

Defendants filed their memorandum of points and authorities in support of the confirmation on November 26, 2012.  It included hundreds of pages of evidence, including declarations of various individuals, including several former employees of SCI, and Stan Deakin, one of the three appraisers appointed by the court.  Also included were the Halvas promissory notes.  The last note which was also signed by plaintiff, dated May 31, 2005, showed an outstanding balance of $2,043,008.37 owing to Halvas, and provided for "interest on the unpaid balance, from date, at the rate of ten percent (10%) per annum."  It also provided that "[t]his Promissory Note reflects and includes all unpaid sums, including accrued interest, that remain outstanding with respect to loans and advances made by the payee to, or on behalf of, the undersigned during the period of June 1, 1996 through and including May 31, 2005 . . . ."

---

[1]  The parties had apparently become involved in a discovery dispute concerning plaintiff's desire to depose various individuals and his request that SCI produce pre-2003 financial and banking records.

Defendants' memorandum urged that the court should confirm the appraisers' unanimous valuation of SCI as having a maximum worth of only $230,000, and that the court should find that Halvas's promissory notes rendered the stock of SCI worthless. Defendants also argued that plaintiff waived, or was judicially estopped to assert his claim for any unpaid salary because he omitted to disclose it during his 2006 divorce proceedings in financial statements given to his wife's forensic accountant. Included in defendants' exhibits were copies of the documents filed in plaintiff's divorce. Defendants alternatively argued that any claim for unpaid salary was time barred because plaintiff's employment with SCI ended in 2008. Defendants also argued that upon payment of a nominal fee for his shares, plaintiff would lose standing to assert the remaining causes of action in his complaint, reasoning that his claim for breach of fiduciary duty was derivative.

On November 26, 2012, defendants filed their witness list for the confirmation hearing, identifying court-appointed appraiser, Larry Grant, defendant Halvas, and CPA Lori Payne.

On November 26, 2012, plaintiff filed his opposition to confirmation of the appraisal report. The opposition urged that the appraisers' fair value determination was not supported by substantial evidence, reasoning the appraisers relied only on the unaudited financial statements of SCI. Alternatively, if the court agreed with the $230,000 valuation, plaintiff urged he should be given the option to purchase Halvas's shares at the "grossly under value" price. Further, plaintiff objected "to [the] entire proceeding because the Court has not stated whether this hearing will include determining and adjudicating the 'two alleged liabilities to the two principal shareholders of the Corporation,' which are: (1) Allal's claim for unpaid salary . . . ; and (2) Halvas' claim based on the Promissory Note he signed to himself on behalf of SCI. The scope of the 'summary' 'fair value' determination provided for by *Corporations Code* § 2000 does not otherwise circumvent Allal's rights to have his unpaid salary claim determined by regular trial. Therefore, Allal objects to these proceedings because of the unusual nature and lack of guidance from the Court of the scope of claims and issues to be decided, including whether this hearing will involve live witness testimony." However, plaintiff also (and somewhat inconsistently)

argued that the appraisal report was incomplete because it failed to determine these two liabilities.

The opposition also urged that the confirmation procedure was improper because defendants did not file a noticed motion to confirm the appraisal; rather, the court ordered the parties to provide simultaneous briefs, which denied plaintiff a fair opportunity to oppose defendants' "motion."

In support of his opposition, plaintiff included a number of declarations. Plaintiff's declaration stated that he was owed $668,358 in unpaid salary, for 1997 through 2006. Beginning in 1996, Halvas represented that SCI did not have the funds to pay plaintiff. Plaintiff never waived his right to unpaid salary during his divorce proceeding.

CPA and forensic accountant Mark Cummins submitted two declarations on behalf of plaintiff. He was retained to review the "fair value" determination in the appraisal report, as well as the amount due on Halvas's loans to SCI. Cummins opined that it was "impossible to verify the validity of the loan balance . . . on the evidence provided." Based on post-2003 bank records, Cummins concluded that Halvas received $1,147,402 more than he transferred to SCI. Crediting the authenticity of a May 31, 2003 promissory note, Halvas would be owed a loan balance of only $570,642.

Cummins also averred that the appraisal report was wrong. According to Cummins, the value of SCI was $2,808,106. Cummins's supplemental report revised the appraisal date, and assigned SCI a value of $2,402,541.

Frederic Clauss submitted a declaration stating that he had been interested in investing in SCI, and that Halvas represented that SCI was worth $19 million.

On November 30, 2012, before the confirmation hearing, defendants moved in limine to prevent plaintiff from introducing any evidence of settlement discussions between the parties. Specifically, defendants sought exclusion of any evidence of a 2008 "Settlement Schedule" prepared by Halvas. Halvas testified during his deposition that the "Settlement Schedule" was prepared during a settlement conference, for use in the parties' settlement efforts. Halvas also submitted a declaration in support of the motion, that the schedule was prepared for purposes of facilitating settlement discussions, and that any

12

discussion in that document of an "unpaid salary" owing to plaintiff was included only to show how small any unclaimed salary of plaintiff's was compared to the salary owing to Halvas.

On November 30, 2012, plaintiff filed a motion for leave to file a first amended complaint, urging that he should be granted leave to state a new claim for unpaid salary, which he argued was based on facts which were newly discovered after the discovery stay was lifted. He urged that any delay in seeking leave to amend was based on the parties' "protracted settlement discussions. . . ." Plaintiff claimed that he learned during discovery that since 2003, Halvas had paid himself over $3.2 million from SCI's bank accounts, and that he had destroyed all pre-2003 bank records. Therefore, Halvas's previous claims that SCI had insufficient funds to pay plaintiff were untrue. Plaintiff argued that defendants would not be prejudiced by the amendment "because they have known about [plaintiff's] unpaid salary claim" and provided extensive briefing about it in their motion to confirm the appraisal report.

On December 3, plaintiff moved ex parte for an order granting him leave to amend, or for an order shortening time on his motion. Defendants opposed the motion for ex parte relief, urging that plaintiff's salary claims were time barred, and that defendants would be prejudiced by the belated amendment because the parties had already completed discovery, and that plaintiff's delay in bringing the claim was inexplicable. On December 3, the trial court denied plaintiff's ex parte application.

## III. The Confirmation Hearing

At the December 3, 2012 confirmation hearing, regarding plaintiff's objections to the hearing, the trial court noted that plaintiff had not, since his "untimely" ex parte application in August, attempted to seek clarification of the scope of the proceedings. Plaintiff's counsel argued that he had not sought clarification because the parties were engaged in settlement discussions. Plaintiff argued that it was not his belief that any of his affirmative claims would be decided at the confirmation hearing, and that the purpose of the hearing was to "determine whether or not [the] appraisal report was correct." Plaintiff

13

also objected to the appraiser, Larry Grant, testifying, urging that because appraisers are not subject to deposition, they may not testify.

The court inquired whether plaintiff's breach of fiduciary duty claim was individual or derivative, and plaintiff represented that it was individual, as Halvas was also his CPA. Plaintiff also explained that it was his belief that his breach of fiduciary duty claim was not "over once this stock buyout happens" because his claim was individual.

The hearing proceeded as follows: The witnesses' declarations submitted in advance of the hearing were deemed to be their direct testimony, and counsel was permitted to cross-examine those declarants that appeared at the hearing.

In her declaration, plaintiff's divorce attorney, Ms. Paula Glickstein, averred that she represented plaintiff in his divorce in 2005 and 2006. She believed that plaintiff was relying on "accounting, financial and tax advice" provided by Halvas. Glickstein relied on Halvas for financial information concerning SCI and plaintiff's income and debts. Halvas also met with the forensic accountant retained by plaintiff's wife. Glickstein averred that plaintiff did not waive any claim to unpaid salary.

Defendants cross-examined Glickstein. According to Glickstein, Halvas met with Mr. Kohn, the forensic accountant retained by plaintiff's wife to determine the value of plaintiff's interest in SCI. Glickstein told plaintiff's wife's attorney that SCI was worth nothing. She did not recall having any discussions with Halvas concerning unpaid salary owing to plaintiff. Glickstein believed it was unlikely that plaintiff waived any right to unpaid salary, because it was not her custom or practice to waive a client's right to money without having a conversation about it, and writing a long letter explaining the risks of waiving a right to something belonging to the community; her records did not contain any such letter to plaintiff. She agreed that unpaid salary would have been community property. Glickstein testified the unpaid salary would have been disclosed in the assets and debts disclosures filed during the divorce. Generally, Glickstein's clients fill out these disclosures themselves, but she reviews them and determines whether anything might be missing. However, there was no reference to any unpaid salary in plaintiff's disclosures.

Defendants called Lori Payne, a CPA hired by defendants to go over SCI's financial records to conduct an independent calculation of the amount due to Halvas on his shareholder loans. Payne examined SCI's QuickBooks records to find transfers from Halvas to the company, and from the company to Halvas. She traced the transfers to corresponding bank records. Payne also examined promissory notes from 1998 to 2009, and relied on bylaws and board resolutions, W2 forms, and payroll records.

In calculating the amount owed to Halvas, Payne began with a 2005 promissory note that was signed by both Halvas and plaintiff. It was the last promissory note signed by both parties, and she "assume[d] because both parties signed that note that they were in agreement that that was the correct number at the time." She then consulted QuickBooks and bank records to determine the amount owing on the loan. According to Payne, interest on the loan was calculated using the rates on the promissory note and the rates stated in the bylaws. She confirmed each decrease in the debt by consulting SCI's bank records. Payne independently calculated the accrued interest, first at rate of 10 percent, and then a lower rate of 7 percent. Payne compounded the interest annually because the promissory notes provided for compound interest.

Payne also testified that Halvas had not received any salary until 2004, even though the board resolutions provided that both plaintiff and Halvas were to receive salary of $150,000 per year. As of June 2004, Halvas was owed $1,275,000. SCI payroll records confirmed that Halvas started to draw a salary in June 2004.

According to Payne, as of January 21, 2011, Halvas was owed $2,548,931.73, including the shareholder loans and accrued but unpaid salary. If unpaid salary were excluded, Halvas would be owed $792,518.58.

Defendants asked Payne if she had reviewed the declaration submitted by plaintiff's CPA, Mark Cummins. She testified that she disagreed with his assessment about what was owing on the promissory notes, as it did not include any accrued interest, and his assessment did not rely on the balances stated in the promissory notes, but rather on a response Halvas provided to an interrogatory. Cummins's calculation also did not

15

consider hundreds of thousands of dollars in transfers made from Halvas to SCI. Therefore, she concluded that Cummins understated the amount due on the loans.

During cross-examination, Payne confirmed that she did not determine how much money Halvas lent to SCI before the May 31, 2005 promissory note she used as her starting point. Payne did not review any bank records preceding the date of the 2005 note. Payne never spoke with plaintiff in the course of her forensic accounting to determine the balance due on the Halvas loans. Payne also did not confirm that the money transferred from Halvas to SCI was necessary for SCI's operations.

Appraiser Larry Grant testified next, over plaintiff's renewed objection. Grant testified that he had been an appraiser since 1959, and conducted over 1,000 business appraisals. He had completed appraisals without audited financial records for the business, and noted that audited financial records are typically only seen in larger corporations. He was not surprised that SCI's financial records were not audited, and it did not affect his ability to appraise the business. Typically, it costs $35,000 to $40,000 a year for a financial audit.

The appraisal took over six months. The appraisers met with the principals, visited the business site, and met with some third parties, including Frederic Clauss (at the request of plaintiff). The appraisers also requested documents from the parties, and both SCI and plaintiff provided information to the appraisers. The appraisers considered all of the information provided by plaintiff in making their appraisal. They also considered the claims made in plaintiff's complaint.

The appraisers applied the customary professional methodologies in making their appraisal, and their valuation of SCI was unanimous. Grant testified that if either of SCI's disputed liabilities was greater than $230,000, the value of SCI would be zero. To determine the value of SCI, the court would deduct any liability from the appraisers' valuation of $230,000.

As for the appraisal provided by plaintiff's appraiser, Mark Cummins, Grant believed his appraisal was flawed because it was more of a critique than an appraisal. For example, Cummins only relied on one year of financial information, instead of the

16

standard five years customarily examined, which overstated the income of the company, and did not consider the fact that the business's one source of revenue, the Navy Cash program, was slated to decline. Cummins also did not deduct owner compensation from the company's cash flow.

Grant noted that in his appraisal, Cummins determined that Halvas was owed $570,642.79 on the promissory notes. If Cummins was correct, Grant testified that the value of SCI would be zero.

During cross-examination, plaintiff asked whether the appraisers had any reason to believe that SCI's financial records were correct, and Grant responded that "[t]he appraisers assumed they were [correct] . . . . [¶] . . . . [¶] We took them as being prepared properly and representative of the assets and liabilities of S.C.I. and we so state that as a condition in our report." Grant acknowledged that plaintiff disputed the accuracy of SCI's financial records. To respond to plaintiff's concerns, the appraisers asked questions of SCI about the financial statements, and about the assets and liabilities of the company, and satisfied themselves that they should use the financial statements.

The appraisers contacted Frederic Clauss over the course of their appraisal, as he had made an offer to purchase SCI in the past. The appraisers did not speak with SCI's largest customer, Navy Cash. However, the appraisers did rely on a forecast of the number of Navy ships being deployed in the future, and from that information determined that Navy Cash revenue would decline. The forecast was prepared by "Navy Cash's project manager . . ." and reported that the number of ships joining the force was declining, and that a number of ships were slated to be decommissioned, decreasing the number of cards from SCI that would be required to service those ships. The appraisers also relied on another forecast prepared by Halvas.

In calculating the fair value of SCI, the appraisers included the accrual of interest on Halvas's loans. Grant agreed that if the loan interest reported was not accurate, that this would affect the fair value determination made by the appraisers.

Grant confirmed that defense counsel had asked him to testify at the confirmation hearing in case the court had any questions about the appraisal, and that he was providing

17

testimony as an "independent, unbiased appraiser." Grant spoke with defense counsel briefly before he provided his testimony.

Grant confirmed that the appraisers did not make an accounting investigation to determine whether the loans were actually made by Halvas.

During redirect, Grant clarified that the appraisers looked beyond the information and forecasts provided by SCI concerning the Navy Cash program. Generally, the appraisers would determine if the Halvas loan was a true loan, and would find the promissory notes sufficient to do so. They did not form an opinion as to this obligation because plaintiff was contesting the validity of the loans. Grant believed that five years of financial records was sufficient to value SCI. Grant did request some documentation beyond the five-year period at the urging of plaintiff's counsel.

After completing his testimony, Grant brought to the court's attention that plaintiff's counsel had sent him an email accusing him of not being "disinterested." Grant told the court that he was disinterested, and only testified to assist the court. The court indicated that it found his testimony to be very helpful.

Defendant Ronald Halvas testified next. He and plaintiff formed SCI in 1996, and used Marc Jacobs, an attorney selected by plaintiff, to form the business entity. Halvas and plaintiff agreed that all loans to fund their venture would accrue 10 percent interest. They memorialized this agreement in a board resolution. Halvas periodically lent money to SCI; first to establish its bank account and then to finance operating expenses. The first loan was documented by Jacobs in a promissory note, which was drafted in 1998. By that time, Halvas had already made multiple loans to SCI, which were all included in the note. The promissory note provided for compound interest, when it recited that "[t]he promissory note reflects and includes all unpaid sums including accrued interest remained outstanding." Plaintiff consented to the note.

Halvas continued to lend money to SCI after 1998, and plaintiff asked that he do so. If Halvas had not made the loans, SCI would have gone out of business. Jacobs continued to prepare the promissory notes through 2003. After 2003, SCI, through Halvas, prepared its own documents with templates that were provided by Jacobs. All of the notes were

signed by plaintiff, through May 31, 2005. After that date, plaintiff resigned as an officer and director and was no longer authorized to sign the notes. Before leaving SCI, plaintiff never disputed the promissory notes or the amounts owed.

All loan disbursements and repayments were noted in SCI's QuickBooks ledger. Halvas made the loans in small increments because it would not make sense for SCI to accrue interest on a large loan, when only small infusions were needed for its operating expenses as they accrued. Halvas and plaintiff regularly discussed SCI's finances; Halvas never concealed SCI's financial condition from plaintiff. Plaintiff also lent money to the business. He was repaid in full and received 10 percent interest on his loan.

Navy Cash is SCI's primary customer. They became a customer in 2000. Over the years, Navy Cash sales declined, and the prospects going forward were not good. It was also discovered that the Navy was searching for other smart card vendors which would essentially replace SCI.

SCI also attempted to expand its BioNet software product, and expended about $4 million to do so. Plaintiff led the sales and marketing efforts for the product, but was unable to generate any customers for BioNet.

At the beginning of SCI's operations, plaintiff and Halvas agreed they would receive salaries of $150,000 per year, but they were unable to take these salaries because SCI did not generate sufficient profits. Consequently, in the beginning, neither Halvas nor plaintiff drew a salary. In 1998, plaintiff started to receive a salary. Although SCI was not profitable, plaintiff was financially unable to defer his income any longer, so Halvas agreed he could receive a salary. Halvas did not start drawing a salary until 2004; he later added his unpaid salary that had accrued over the years to the promissory notes. Plaintiff remained on the payroll until 2008, when he left the company. Plaintiff never demanded any unpaid salary from SCI. When plaintiff left the business in 2008, he was not owed any unpaid salary.

In 2005 and 2006, Halvas was asked to provide SCI's financials to plaintiff's divorce attorney. Halvas also met with the forensic accountant retained by plaintiff's wife, Mark Kohn. During conference calls with plaintiff and his attorney, discussing the

19

financial condition of SCI, when Halvas revealed that SCI had contingent liabilities for unpaid salaries to both plaintiff (for salary accrued before 1998) and Halvas, plaintiff's attorney was concerned "that would pose a problem for Mr. Allal with his now ex-wife's attorney." Plaintiff's attorney explained that if plaintiff waived his claim to any unpaid salary, he would not have to disclose it in the divorce proceedings. Therefore, plaintiff agreed to waive any claim to unpaid salary. Halvas was instructed to prepare financial statements for SCI which excluded any claim to unpaid salary by plaintiff. Plaintiff reviewed all of the documents before they were passed along to Kohn. Halvas represented to plaintiff's attorney that SCI was worth nothing.

Plaintiff attempted to impeach Halvas with exhibit 30, a 2008 email chain in which Halvas discussed contingent salaries owed to him and plaintiff. Defendants objected that the communication was made during the course of a settlement conference for purpose of settlement, and therefore was not admissible. The court deferred ruling on the objection, allowing plaintiff to question Halvas. The court also allowed provisional questioning about plaintiff's exhibit 1, to which defendants again interposed a settlement privilege objection. When asked if plaintiff was asserting a claim for unpaid salary in 2008, Halvas testified that he was not, but that Halvas thought it was necessary to include any potential salary claim in the settlement discussions in an abundance of caution.

Halvas admitted that all of SCI's bank records, from before June 2003, had been destroyed. It was Halvas's practice to only retain seven years of documents.

At the conclusion of the testimony, the trial court asked the parties how they believed it should proceed. The court indicated that the parties could engage in oral argument, and discuss the evidence submitted, including the live testimony and the declarations and exhibits. They could also submit closing briefs and proposed orders to the court, "as to this confirmation hearing as to what you think based on the evidence and the law the court should ultimately be ordering as to this appraisal part of it." Plaintiff's counsel found the proposed procedure "agreeable . . . ."

The trial court suggested that the parties further brief the issue of the admissibility of plaintiff's exhibits 1 and 30. The parties stipulated to admission of all other exhibits.

The parties' briefs were to be submitted by January 14, 2013. The court set a status conference for January 28, where it would announce its tentative ruling, and the parties could provide any argument.

Defendants' closing brief urged that the appraisal was supported by substantial evidence and should be confirmed. Defendants also argued that substantial evidence demonstrated that any unpaid salary claim by plaintiff was waived, and that plaintiff omitted the "asset" from his divorce disclosures. Moreover, Halvas's loans were supported by substantial evidence. Plaintiff signed seven promissory notes confirming the debt, and the notes were prima facie evidence of the debt. Defendants also argued the loans complied with Corporations Code section 310. Defendants urged that the court should set a date for defendants to purchase plaintiff's shares for a nominal amount, and that upon the purchase of his shares, plaintiff's remaining claims should be dismissed, as he would lose standing to assert them.

Plaintiff's closing brief argued that the appraisers' fair value determination was erroneous and should not be confirmed, and that the appraisers wrongly assumed the accuracy of SCI's financial records. Plaintiff urged that Halvas's loans unfairly devalued SCI. Plaintiff argued that the fair value of SCI was over $2.4 million, as determined by his expert, Cummins. Moreover, plaintiff argued that Halvas long ago had been repaid on his loans, and if the court considered only post-2003 transactions (for which there were bank records), that Halvas in fact owed SCI money. Plaintiff also argued that the promissory note was unenforceable because it compounded the interest without an express agreement to do so. Plaintiff further argued that he did not waive his claim for unpaid salary, and that Halvas's testimony on this subject violated plaintiff's attorney-client privilege. Plaintiff also urged he should be awarded his unpaid salary claim, or that his claim should be tried along with his claim for breach of fiduciary duty.

At the January 28, 2013 hearing, the court issued its tentative opinion, which was to confirm the appraisal, and set a purchase price of $500 for plaintiff's shares. The court ruled that plaintiff had waived any attorney-client privilege concerning the issue of his waiver of unpaid salary. As to exhibits 1 and 30, the court concluded that the documents

were protected by the settlement privilege, reasoning "[i]t seems clear to me that they are within the purview of settlement discussions and should not be considered." The court concluded that plaintiff would lose standing, upon the sale of his shares, to bring his remaining claims. Plaintiff requested a statement of decision. Defendants were ordered to submit a proposed order and statement of decision by February 13, 2013.

Plaintiff's motion for leave to amend his complaint was set for hearing on February 13, 2013. Defendants opposed the motion. First, defendants argued that the motion was not properly served upon them, as it was served by email, notwithstanding the lack of an agreement between the parties for electronic service. Although it was filed on November 30, 2012, it was not served until January 25, 2013, which was untimely under Code of Civil Procedure section 1005, subdivision (b). Alternatively, the opposition argued that the requested amendment was dilatory. In his declaration in opposition to confirmation of the appraisal, plaintiff averred that he filed this lawsuit because he was owed unpaid salary; he also testified that he was owed salary in his deposition. Moreover, defendants argued that the new claims were subject to demurrer because plaintiff waived any right to claim his back salary, and the claim was also time barred.

In reply, plaintiff argued that defendants had notice of the motion since November, and were not surprised by the motion. Plaintiff argued his motion was timely, as he discovered the facts underlying the new complaint after the discovery stay was lifted. Plaintiff also argued that his claims were not subject to demurrer.

On February 11, plaintiff submitted objections to the proposed statement of decision submitted by defendants. He argued that he did not have notice that his breach of fiduciary duty claim would be substantively adjudicated, and urged that his breach of fiduciary duty claim was not derivative. He also objected to the "substantive adjudication" of his unpaid salary claim.

On February 13, the trial court adopted its tentative ruling on the confirmation of the appraisal as its order, and denied plaintiff's motion for leave to amend, finding the motion was not properly served in the first instance, and that plaintiff inexplicably and

22

prejudicially delayed in seeking to allege his claim for unpaid salary despite knowing he had such a claim when he left his employment in 2008.

After considering the parties' objections to its confirmation order, the trial court issued its final order and decree on March 11, 2013. The court issued a 22-page statement of decision, which not only discussed the evidence, but the various objections which arose over the course of the proceedings, including plaintiff's objection to the presentation of live testimony, to the testimony of appraiser Larry Grant, to the testimony of defendants' experts, to the introduction of evidence concerning plaintiff's divorce proceedings, as well as defendants' objections to plaintiff's exhibits 1 and 30.

The court found that the appraisal report was based on substantial evidence, and that the fair value of SCI, before considering its liabilities, was $230,000. The court found that the debt to Halvas was valid, and at very least totaled $792,518.58, which necessarily rendered SCI valueless. The court found that the May 31, 2005 promissory note signed by plaintiff was prima facie evidence of the debt. The court also concluded that plaintiff waived any unpaid salary claim in his divorce proceeding, and was also judicially estopped from recovering any unpaid salary due to his failure to disclose it as an asset in his divorce proceedings. Moreover, the court found that any unpaid salary claim was time barred under Labor Code section 201, subdivision (c), because his claim accrued in 2008 when he was terminated. Lastly, the court found that plaintiff would lose standing to assert any of his remaining claims upon the purchase of his shares. In the event the shares were not purchased within 30 days, the trial court would set a trial date.

On March 20, defendants elected to purchase plaintiff's shares, and confirmed that payment was tendered on March 14.

On March 29, plaintiff made additional objections to the court's order, which the trial court rejected. Defendants had to seek court intervention to have plaintiff transfer his shares.

Plaintiff filed his notice of appeal of the March 11 order on May 10, 2013.

On May 10, 2013, defendants lodged a proposed judgment with the trial court, dismissing the remainder of plaintiff's claims, as defendants had purchased plaintiff's

23

shares of SCI.  Plaintiff objected to the proposed judgment, urging that it exceeded the scope of the Corporations Code section 2000 proceedings.  The trial court entered the proposed judgment on May 30, 2013.  The judgment provided that defendants "are the prevailing parties in this litigation and are entitled to recover from Plaintiff their costs of suit in this action, including attorneys' fees to the extent allowed by law, to be determined and entered hereon in accordance with the *Code of Civil Procedure . . . .*"

## IV.    Costs

On June 17, 2013, defendants submitted a memorandum of costs, seeking among other costs, $74,680.60 incurred for the appraisal.  Plaintiff moved to tax the claimed costs, reasoning that defendants were not prevailing parties, as plaintiff was awarded the only monetary recovery in the case, that Corporations Code section 2000 does not provide for recovery of costs, and that it would be inequitable to award costs against plaintiff because the outcome of the case was devastating for him.  He also sought to tax the appraisal and deposition costs, reasoning that appraisal costs are not statutorily authorized, and that the deposition costs were not necessary.

In opposition, defendants argued that the trial court's judgment declared them to be prevailing parties.  Moreover, defendants pointed out that plaintiff did not achieve any of his litigation objectives.  They also argued that because Corporations Code section 2000 is silent on the issue of costs, the general cost statute, Code of Civil Procedure section 1032, applies.  Defendants argued that all of their costs were reasonably necessary, and that the appraisers were experts appointed by the court.

The court awarded defendants costs of $47,762.17, representing half of the appraisal fees and the entirety of the other claimed costs.

Plaintiff filed a notice of appeal on October 3, 2013.  This court consolidated plaintiff's appeals.

### DISCUSSION

## I.    Breach of Fiduciary Duty Claim

Plaintiff challenges the dismissal of his breach of fiduciary duty cause of action, reasoning the claim was not derivative, and therefore, he did not lose standing once his

24

shares of SCI were purchased by Halvas. Plaintiff also contends the dismissal of his claim violated his right to due process, because the trial court dismissed it without prior notice to plaintiff. We find no merit in either of these contentions.

### A. Plaintiff's claim was derivative.

A shareholder bringing a derivative action on behalf of a corporation must maintain continuous ownership of stock over the course of the litigation. Therefore, once a plaintiff loses stock ownership, the plaintiff loses standing to maintain a derivative action. (See Corp. Code, § 800, subd. (b); *Grosset v. Wenaas* (2008) 42 Cal.4th 1100, 1114-1115; see also *Cotton v. Expo Power Systems, Inc.* (2009) 170 Cal.App.4th 1371, 1383 (*Cotton*).) After defendant Halvas purchased plaintiff's stock in SCI, the trial court dismissed plaintiff's cause of action for breach of fiduciary duty, finding he had lost standing. The propriety of the trial court's dismissal, which we review de novo, rests on whether the claim asserted in plaintiff's complaint was derivative or individual. (See, e.g., *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166.)

Whether an action is derivative or individual depends not on the form of the action, but its substance or gravamen. "A derivative suit is a suit brought on behalf of a corporation for injury to the corporation, often for breach of fiduciary duty, mismanagement or other wrongdoing by corporate officers or directors, or for wrongs against the corporation by third parties. [Citation.] An action is derivative ' "if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets." ' [Citations.]" (*Vega v. Jones, Day, Reavis & Pogue* (2004) 121 Cal.App.4th 282, 297.) "[A]n individual cause of action exists only if the damages [claimed by the plaintiff] were not *incidental* to an injury to the corporation. [Citation.]" (*Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 124.)

Although plaintiff attempts to style his claim as one for a breach of the fiduciary duties Halvas owed to him as his CPA, the allegations of his complaint make clear that this is not the basis for his breach of fiduciary duty claim, and that any harm was occasioned

25

upon SCI, not plaintiff individually. Plaintiff alleged that Halvas had not developed any new business for SCI, and had "been taking unreasonable and unearned salaries, profits, and other benefits from SCI"; "drain[ed] money from . . . SCI"; "filed false tax returns"; used "SCI as his own piggy-bank"; among other allegations. The cause of action for breach of fiduciary duty additionally alleged that "[a]s a Director of SCI, Halvas owed plaintiff fiduciary duties. The fiduciary duties imposed . . . included the duty to act with the utmost good faith." Halvas violated these duties by refusing plaintiff access to SCI records, paying himself unearned compensation but refusing to pay plaintiff compensation, and disguising income with "bogus" promissory notes to divert money from SCI.

Plaintiff contends this case is like *Jara v. Suprema Meats, Inc.* (2004) 121 Cal.App.4th 1238 (*Jara*), where the plaintiff alleged that the majority shareholders breached their fiduciary duty to the plaintiff, the minority shareholder, by paying themselves excessive compensation and denying the plaintiff a fair share of the corporate profits. (*Id.* at p. 1242.) In *Jara*, during trial the court granted a motion in limine to exclude evidence the corporation paid the majority shareholders excessive compensation, reasoning that claim had to be asserted as a derivative claim on behalf of the corporation. (*Id.* at pp. 1242-1243.) The Court of Appeal found error under *Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93, which held that a minority shareholder may sue individually for the majority shareholders' breach of fiduciary duty which results in the majority's retention of a disproportionate share of the corporation's ongoing value. (*Jara,* at p. 1258.)

*Jara* is of little assistance here, as the excessive compensation in that case did not harm the corporation; to the contrary, the corporation experienced "extraordinary growth while preserving operating reserves and access to credit." (*Jara*, *supra*, 121 Cal.App.4th at p. 1258.) In *Jara*, only the plaintiff was injured, when his individual share value was diminished. Here, plaintiff alleges Halvas's various acts depleted the assets of SCI.

Plaintiff argues that equitable exceptions to the continuous ownership requirement exist, or that a statutory exception under Corporations Code section 800 may apply.

26

However, plaintiff did not provide any record citations to demonstrate he raised those issues below; consequently, we decline to consider them now.

**B.      Plaintiff had adequate notice that his claim was subject to dismissal.**

Plaintiff next argues the trial court violated his right to due process when it "sua sponte" dismissed his claim for breach of fiduciary duty, without prior notice.  The argument is plainly untrue and ignores the numerous times during the proceedings described above when the parties discussed with the court whether Halvas's purchase of plaintiff's shares after the confirmation hearing would eliminate plaintiff's standing to maintain a derivative breach of fiduciary duty claim.

For example, on February 7, 2012, in their post-appraisal status conference statement, defendants argued with citation to legal authority that if the appraisal was confirmed, and plaintiff was paid for his shares, his remaining claim for breach of fiduciary duty should be dismissed because it was derivative, and plaintiff would lose standing once he was no longer a shareholder of SCI.  Plaintiff's status conference brief responded that his breach of fiduciary duty claim was not derivative.

The appraisal report was lodged with the court on February 17, 2012.  After the appraisal report was lodged with the court, at the March 22 status conference, the court found that some sort of "hearing" or "court trial" was required to determine the validity of the claims not decided by the appraisers.  Again, the parties asserted their arguments in support and in opposition to defendants' assertion that, if the appraisal were confirmed, plaintiff's remaining claims would be dismissed.  The court requested trial briefs addressing whether, following confirmation of the appraisal, there were any remaining issues to be tried.

Moreover, following the confirmation hearing, defendants' closing brief urged that the court should set a date for defendants to purchase plaintiff's shares for a nominal amount, and that upon the purchase of his shares, plaintiff's remaining claims should be dismissed.

When the court issued its tentative ruling to confirm the appraisal, and set a purchase price of $500 for plaintiff's shares, the court also stated its view that plaintiff

would lose standing, upon the sale of his shares, to bring his remaining claims. Plaintiff's counsel was present at that hearing, and made clear that he disagreed with the court's order. The actual order of dismissal was not entered until some months later.

Due process requires notice and an opportunity to be heard. (*Mullane v. Cent. Hanover Bank & Trust Co.* (1950) 339 U.S. 306, 313.) Here, the issue of standing was repeatedly raised by defendants, and the court invited the parties to brief whether, following confirmation of the appraisal, there were any remaining issues to be tried. Plaintiff was on notice that his claim was subject to dismissal. He also received notice of the court's intent to dismiss the claim months in advance of the final order actually dismissing it. There is no merit whatever to his contention that the trial court dismissed his claim "sua sponte," without notice.

## II.    Denial of Leave to Amend

Plaintiff next argues that the trial court abused its discretion when it denied his motion for leave to amend his complaint to state causes of action for breach of contract (for unpaid salary) and fraud. "[T]he discretionary power to allow amendments to the pleadings . . . must be exercised liberally at all stages of the proceeding." (*Edwards v. Superior Court* (2001) 93 Cal.App.4th 172, 180.) Nonetheless, leave to amend may be denied when the party seeking leave has delayed in seeking relief and has not provided an adequate explanation for the delay, or where the party opposing amendment demonstrates prejudice from the amendment. (*Record v. Reason* (1999) 73 Cal.App.4th 472, 486; *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 486-487.) A trial court's ruling on a motion to amend is reversed only upon a showing of " 'manifest or gross abuse of discretion. [Citations.]' [Citation.]" (*Record v. Reason*, at p. 486.)

Here, the trial court concluded that "[t]he motion was not properly served in the first instance. Regardless, the motion is without merit. Plaintiff has been dilatory in presenting his allegedly new claims and has provided no adequate grounds for the delay. Although plaintiff may have encountered difficulty in obtaining the evidence to support his claim for unpaid back salary, plaintiff indisputably knew he was not paid all the salary he was owed when he left his employment in 2008. Difficulty in ascertaining exactly how

28

much he was allegedly owed is not an excuse for failing to assert the claim for almost five years. Defendant has clearly established prejudice since based on the court's tentative ruling made after the confirmation hearing, if defendants timely purchase plaintiff's shares the case will be over in the trial court."

The court did not abuse its discretion. The only explanation offered by plaintiff for his failure to seek leave to amend sooner was that discovery had been stayed, and the facts underlying the claim for unpaid salary, and the claim for fraud were discovered only once discovery was commenced. However, the original complaint alleged that Halvas had paid himself substantial sums of money based on bogus "loans" he made to SCI, yet plaintiff had not been paid his salary. Clearly, the trial court was well within its discretion to determine that plaintiff was dilatory in seeking leave to amend, and had not adequately explained his failure to seek leave sooner. (See *Lloyd v. Williams* (1964) 227 Cal.App.2d 646, 648.)

## III. The Appraisal

Plaintiff claims a number of errors related to the appraisal under Corporations Code section 2000. Section 2000 provides that when a shareholder sues for involuntary dissolution, the corporation, or the holders of 50 percent or more of the voting power of the corporation, may purchase the shares. The shares must be purchased at their "fair value." (§ 2000, subd. (a).) The statute defines "fair value" as "the liquidation value as of the valuation date but taking into account the possibility, if any, of sale of the entire business as a going concern in a liquidation." (*Ibid.*) The valuation date is the date that the involuntary dissolution proceeding was commenced, unless the court designates another date, upon a showing of good cause. (*Id.*, subd. (f).) The court must appoint three disinterested appraisers to appraise the fair value of the company's shares. (*Id.*, subd. (c).) The award of the appraisers, when confirmed by the court, shall be final and conclusive upon all parties. However, "if the court concludes that the appraisers' award is incorrect, rather than confirm the award, the court must examine the matter de novo and fix the correct value." (*Cotton*, *supra*, 170 Cal.App.4th at p. 1376.)

29

**A.      Dismissal of plaintiff's cause of action for involuntary dissolution with prejudice.**

Plaintiff complains the trial court erroneously found the dismissal of his cause of action for involuntary dissolution was "with prejudice." The short answer is, the trial court later vacated the dismissal pursuant to a stipulation between the parties.

In his reply brief, plaintiff contends the "stipulation" found by the trial court "does not meet the requirements of being a binding stipulation because it was not made in open court and entered in the minutes of the court, nor was it in writing." We disagree. The court's minutes reflect a stipulation between the parties; whether this stipulation was evidenced by a writing is a matter outside the record on appeal.

Therefore, any claimed error as to the dismissal, with prejudice, is moot.

**B.      The appraisal is supported by substantial evidence.**

Plaintiff next contends the appraisal was not based on substantial evidence, as it relied on SCI's unaudited financial statements, reasoning that these records were inaccurate because they were prepared by Halvas, and Halvas had destroyed all pre-2003 bank records.[2] He argues that no reasonable investor would purchase SCI's shares based on its unaudited financials. He also argues that the appraisal did not consider other reliable evidence of the company's worth, such as past stock sales. Plaintiff seeks a declaration from this court that "an appraisal award should be based on solid financial statements. . . ." Corporations Code section 2000 does not require that the appraisers rely only on audited financial statements. It only requires that "three disinterested appraisers . . . appraise the fair value of the shares owned by the moving parties," and does not specify what information those appraisers are to rely upon. (See § 2000, subd. (c).)

---

[2]      Defendants contend that any challenge to the sufficiency of the evidence has been waived by plaintiff's failure to fairly summarize the evidence. While we agree that plaintiff has not discussed the overwhelming evidence supporting the trial court's confirmation of the appraisal, we nevertheless exercise our discretion to reach the merits of plaintiff's challenge.

Appraiser Larry Grant testified that audited financials are uncommon in small corporations, and that he had no concerns about the reliability of the records on which he and the other appraisers relied. "The trial court's confirmation of the appraiser's report is primarily a factual determination, which must be affirmed if supported by substantial evidence." (*Trahan v. Trahan* (2002) 99 Cal.App.4th 62, 70.) Although there was other evidence that plaintiff believes the appraisers and the court should have credited, the fact remains that substantial evidence summarized above at length supported the appraisal and confirmation. Plaintiff is simply asking this court to reweigh the evidence which we cannot do.

### C.    Due process.

Plaintiff complains the appraisal was defective because the appraisers did not determine the two liabilities of SCI; namely his unpaid salary claim, and Halvas's promissory notes. Plaintiff, relying on *Cotton*, *supra*, urges that the appraisal report could not be confirmed, because it was not complete. Plaintiff's reliance on *Cotton* is misplaced. In *Cotton*, the appraisal report was deemed incomplete because it did not value an asset of the corporation, and the trial court confirmed the appraisal without valuing the asset. The Court of Appeal reversed, finding "[t]he court was required to either obtain a complete appraisal of the fair value . . . from the appraisers, or conduct a hearing to resolve the matter." (*Cotton*, *supra*, 170 Cal.App.4th at pp. 1381-1382.) Here, the trial court conducted a hearing to resolve and value the disputed liabilities.

Plaintiff also complains that the trial court did not proceed with the appraisal as a traditional noticed motion, and it was unclear what would be decided in the confirmation hearing. Plaintiff argues that due process requires notice of the scope of the confirmation hearing. He, rather inconsistently, argues that his due process rights were violated when the trial court adjudicated his salary claim as well as Halvas's promissory notes without reasonable prior notice that these claims would be determined during the confirmation hearing.

The appraisal report made clear that the appraisers were not going to decide the "dispute between the two principal shareholders about the validity of at least two alleged

31

liabilities of the Company, in particular one alleged amount owed to Ronald Halvas in the amount of $2,553,169 and a second alleged amount owed to Francois Allal in the amount of $913,542 [for unpaid salary]. The appraisers are unable to render a legal opinion as to the validity of either of these two disputed liability claims." The appraisers noted that they determined the fair value of SCI under two scenarios: (1) assuming the existence of the liabilities; and (2) assuming the nonexistence of the liabilities. The appraisers further noted that they "assume the Court will determine the legal validity and amount of the liability claims." Clearly, the appraisal report itself made clear that a determination as to these liabilities was essential to fix the value of SCI.

At the March 22, 2012 status conference, the trial court made clear that it would conduct a "court trial" or "hearing" on the disputed liabilities that the appraisers did not decide. Moreover, when discussing the nature of the confirmation hearing in open court, defendants made clear that it would necessarily encompass "a determination of whether or not [the claims] are valid in whole or in part." The trial court set a briefing schedule for the confirmation hearing, providing for the simultaneous exchange of briefs. Both parties submitted briefs which provided evidence and argument concerning the salary claims and the promissory notes. Quite simply, plaintiff's due process claim is belied by the record.

**D.      Misconduct by the appraisers.**

Plaintiff contends the appraisers refused to contact the Navy to verify whether income from this customer would decrease. This can hardly be characterized as misconduct. The appraisers were satisfied with reports and information they received that the Navy was reducing its fleet, and accordingly, that Navy Cash revenue was declining, and would continue to do so.

Plaintiff also contends appraisers Stan Deakin and Larry Grant improperly testified as advocates for Halvas (Deakin by declaration and Grant by live testimony). He argues that the appraisers should not have been allowed to testify because plaintiff did not have the right to depose them. Plaintiff cites *Abrams v. Abrams-Rubaloff & Associates, Inc.* (1980) 114 Cal.App.3d 240, 247-248, which held that Corporations Code section 2000 does not provide for a full evidentiary hearing, or permit a party to depose the appraisers or

32

the witnesses on whom they rely. He extrapolates from this ruling a bar on appraiser testimony at a confirmation hearing. We find nothing in section 2000 that prohibits live testimony from appraisers. Here, the testimony of the appraisers assisted the court in understanding their report. Plaintiff was afforded an opportunity to extensively cross-examine Grant. There was no impropriety.

**E. Ruling on the promissory notes.**

Plaintiff contends the trial court applied the wrong legal standard when it determined that Halvas's promissory notes were valid. He contends that director loan transactions must be subjected to a "rigorous scrutiny" standard of review. Plaintiff relies on *Efron v. Kalmanovitz* (1964) 226 Cal.App.2d 546, 556, which provides that " '[a] director is a fiduciary. [Citation.] So is a dominant or controlling stockholder or group of stockholders. [Citation.] Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein." Plaintiff also cites Corporations Code section 310, which provides that, concerning contracts between the corporation and one of its directors, "the person asserting the validity of the contract or transaction sustains the burden of proving that the contract or transaction was just and reasonable as to the corporation at the time it was authorized, approved or ratified." (*Id.*, subd. (a)(3).)

Regardless of the standard of review applicable in the trial court, this court will affirm the trial court's finding if it is supported by substantial evidence. (*Trahan v. Trahan*, *supra*, 99 Cal.App.4th at p. 70.) The loans were expressly authorized by corporate resolution. Moreover, plaintiff also signed the vast majority of the promissory notes. Halvas testified that SCI would not have been able to meet its obligations if he had not lent it money. We find substantial evidence supports the trial court's determination of the validity of the loans. Moreover, contrary to plaintiff's contention on appeal, it is irrelevant that the trial court did not fix an exact amount owing to Halvas. Its finding that the loan

33

balance exceeded $792,000 was sufficient, under the facts of this case, as this amount clearly exceeded the value of SCI, rendering it worthless.

**F.      Ruling on plaintiff's salary claim.**

Plaintiff contends the trial court's finding that he waived any claim to unpaid salary during his divorce proceedings was in error.  Plaintiff admits there was a conflict between his and Halvas's testimony on the issue of salary waiver.  He nevertheless argues that the evidence relied upon by the court was not "clear and convincing" evidence of waiver.  However, we review the trial court's finding for substantial evidence, regardless of the standard applicable in the trial court.  (*Crail v. Blakely* (1973) 8 Cal.3d 744, 750.)

"[A] waiver is the intentional relinquishment or abandonment of a known right or privilege. . . .  [Citation.]  Waiver is a question of fact."  (*Smith v. Selma Community Hosp.* (2008) 164 Cal.App.4th 1478, 1506.)  The testimony provided by Halvas, plaintiff's own divorce attorney, and the documentary evidence from his divorce all tended to demonstrate that plaintiff waived his claim to his unpaid salary in order to avoid any community claim to it by his wife.  This evidence alone supports the trial court's finding regarding this liability.

Plaintiff also contends the trial court erroneously excluded exhibits 1 and 30, which supported his claim for unpaid salary.  Exhibit 1 consisted of a "Shareholder Accounts" list for SCI, which was created in May 2008 and included an accrued salary owing to plaintiff of $337,500, for salary he was not paid in 1997, 1998, and 1999.  Exhibit 30 consisted of email communications between Halvas, plaintiff, and attorney Marc Jacobs from September 2008.  The communications make clear that plaintiff and Halvas were attempting to resolve a dispute, and address plaintiff's desire to be bought out of his shares of SCI.  Marc Jacobs was communicating with Halvas in an attempt to settle a dispute between the parties.  In defendants' motion in limine to exclude these exhibits, Halvas made an offer of proof that the documents were made in the course of settlement discussions between the parties.

The trial court excluded these documents under Evidence Code section 1152, which provides, in relevant part, that "[e]vidence that a person has, in compromise or from

34

humanitarian motives, furnished or offered or promised to furnish money or any other thing, act, or service to another who has sustained or will sustain or claims that he or she has sustained or will sustain loss or damage, as well as any conduct or statements made in negotiation thereof, is inadmissible to prove his or her liability for the loss or damage or any part of it." The statute was drafted to broadly include conduct and statements made in the context of settlement negotiations. (*Caira v. Offner* (2005) 126 Cal.App.4th 12, 32.) We review a trial court's ruling under section 1152 for abuse of discretion. (*Id.* at p. 41.) Halvas's offer of proof was sufficient for the trial court to conclude that the exhibits were inadmissible under section 1152. We find no abuse of discretion.

## IV. Costs

Code of Civil Procedure section 1032, subdivision (b) entitles the prevailing party in an action to recover certain litigation costs as a matter of right. Section 1032 defines the prevailing party as "the party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant. When any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not and, if allowed may apportion costs between the parties . . . ." (§ 1032, subd. (a)(4).) Section 1033.5, subdivision (a) sets forth the items that are allowable as costs under section 1032. The allowable items include "[f]ees of expert witnesses ordered by the court" and the costs associated with "necessary depositions. . . ." (§ 1033.5, subds. (a)(3), (8).) We review for abuse of discretion whether a costs award is reasonable, but "because the right to costs is governed strictly by statute [citation][,] a court has no discretion to award costs not statutorily authorized. [Citations.]" (*Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774.)

Plaintiff contends the cost award, apportioning to him half the costs claimed by defendants ($47,762.17), was in error, reasoning that Corporations Code section 2000 does not provide for an award of costs to the prevailing party.

35

Corporations Code section 2000 is silent on the issue of the recovery of costs by a prevailing party,[3] and therefore, Code of Civil Procedure section 1032 is the controlling statute. (See *Benson v. Kwikset Corp.* (2007) 152 Cal.App.4th 1254, 1283-1284.) Here, the statement of decision provides that defendants are the prevailing parties. It was within the court's discretion to find defendants were prevailing parties; they obtained dismissal of the majority of plaintiff's claims, and bought him out of his shares of SCI for the nominal fee of $500. Moreover, it was not an abuse of discretion to apportion the appraisal costs evenly between the parties. Although plaintiff argues the case was a disaster for him, and it was inequitable to require him to pay half of the costs, the trial court was free to conclude that it would be unfair for defendants to bear the entire burden of the appraisal under all the circumstances here.

## DISPOSITION

The judgment and order are affirmed. Defendants are awarded their costs on appeal.


GRIMES, J.

We concur:


BIGELOW, P. J.


FLIER, J.

---

**3** Corporations Code section 2000, subdivision (c) does provide: "If the purchasing parties do not make payment for the shares within the time specified, judgment shall be entered against them and the surety or sureties on the bond for the amount of the expenses (including attorneys' fees) of the moving parties." This provision does not relate to costs for a prevailing party. Moreover, it has been held that a prevailing party is entitled to its costs under a predecessor statute. (See *Merlino v. Fresno Macaroni Mfg. Co.* (1946) 74 Cal.App.2d 120, 124.)